**AMISUB, INC., (ST. JOSEPH HOSPITAL), Plaintiff–Appellant,**

**v.**

**Donna E. SHALALA, Secretary of Health and Human Services, Defendant–Appellee.**

**No. 93–1623.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 9, 1993.

Decided Jan. 5, 1994.

Byron J. Gross, Los Angeles, CA, argued (Patric Hooper and Gina M. Reese, on the brief), for plaintiff-appellant.

Jamie G. Crawford, of DHS, Kansas City, MO, argued, for defendant-appellee.

Before BEAM, Circuit Judge, LAY, Senior Circuit Judge, and BOGUE,* Senior District Judge.

LAY, Senior Circuit Judge.

AMISUB, Inc. (St. Joseph's Hospital) ("AMISUB") appeals the district court's affirmance of a final decision of the Secretary of Health and Human Services (the "Secretary") concerning the application of the Deficit Reduction Act of 1984 ("DEFRA") to AMISUB's purchase of St. Joseph Hospital in Omaha, Nebraska. At issue is whether an Agreement in Principle, pursuant to which AMISUB purchased St. Joseph Hospital, would allow AMISUB to step-up the basis of its depreciable assets from their historical cost to their acquisition cost for Medicare reimbursement purposes. The district court[1] affirmed the Secretary's finding that the Agreement in Principle was not an "enforceable agreement" under § 2314(c)(1) of DEFRA, and thus denied AMISUB a step-up in basis. We now affirm.

## I.

Title XVIII of the Social Security Act of 1965, 42 U.S.C. § 1395 et seq. (the "Medicare Act"), provides federal reimbursement for the "reasonable cost" of providing services related to the care of Medicare beneficiaries. Id. at § 1395f(b)(1); 42 C.F.R. § 413.9(a). Among the reasonable costs related to patient care which are reimbursable are capital-related costs, including an appropriate allowance for depreciation of buildings and equipment used in the provision of patient care. 42 C.F.R. §§ 413.130, 413.134(a), 413.-153(a)(1). Prior to 1984, when a provider acquired an entire facility as an ongoing operation, the provider's basis in all assets of the facility for the purposes of determining reimbursable depreciation expenses was equal to the total purchase price the provider paid for the facility, not to exceed the fair market value of the facility or the combined fair market value of all assets of the facility. 42 C.F.R. § 134(g)(2). In other words, a purchaser of a health care provider was allowed to increase ("step-up") the basis in the acquired provider's depreciable assets to the full purchase price, regardless of what the seller's basis had been. See H.R.Conf.Rep. No. 861, 98th Cong., 2d Sess. 1338 (1984), reprinted in 1984 U.S.C.C.A.N. 697, 2026. On July 18, 1984, Congress enacted the Deficit Reduction Act of 1984 ("DEFRA"), Pub.L. No. 98–369, 98 Stat. 494 (1984). Section 2314(a) of DEFRA (codified at 42 U.S.C. § 1395x(v)(1)(O)), amended the Medicare Act by imposing a limitation on the revaluation of assets when a change of ownership occurs for purposes of determining reimbursement of capital-related costs under the Act. As a result, the Medicare Act no longer permits a "step-up" in the cost basis of depreciable assets from the historical costs of the prior owner to the acquisition cost of the new owner. Under § 2314(a), the purchaser of a Medicare provider is limited to a basis equal to "the lesser of the allowable acquisition cost of such asset to the owner of record as of July 18, 1984 (or, in the case of an asset not in existence as of such date, the first owner of record of the asset after such date), or the acquisition cost of such asset to the new owner." 42 U.S.C. § 1395x(v)(1)(O)(i). However, there is a "grandfather" exception to the valuation limitation of DEFRA. Section 2314(c)(1) provides that the basis limitation under § 2314(a) "shall not apply to changes of ownership of assets pursuant to an enforceable agreement entered into before the date of the enactment of this Act [July 18, 1984]." Pub.L. No. 98–369, § 2314(c)(1), 98 Stat. 1079 (1984). The issue in the case is whether American Medical

---

* The Honorable Andrew W. Bogue, Senior United States District Judge for the District of South Dakota, sitting by designation.

1. The Honorable Lyle E. Strom, Chief Judge, U.S. District Court for the District of Nebraska.

International, Inc. (AMI), AMISUB's corporate parent, entered into an enforceable agreement with Creighton Omaha Regional Health Care Corporation (CORHCC) to purchase St. Joseph Hospital on or before July 17, 1984.

As the district court noted, the material facts surrounding AMISUB's purchase of St. Joseph Hospital are not in dispute. On May 24, 1984, AMI and CORHCC entered into an Agreement in Principle whereby AMI agreed to purchase and CORHCC agreed to sell the assets of St. Joseph Hospital in Omaha, Nebraska, a teaching hospital affiliated with Creighton University. The Agreement in Principle required AMI to pay CORHCC approximately $99 million, and contained a detailed description of the terms of performance for both parties, including a summary of commitments by AMI to both Creighton University and CORHCC regarding the governing structure of the facility, as well as operational, spiritual, educational, and research commitments. The Agreement in Principle provided that the sale would be consummated upon satisfaction of four express conditions. First, the sale must be approved by all necessary state and local regulatory authorities. Second, CORHCC's balance sheet dated February 29, 1984, and related income statement, must fairly represent the financial condition of St. Joseph Hospital in accordance with generally accepted accounting principles. Third, there may be no material adverse deviation in the condition of the assets or the financial operation of the hospital as of the date of the balance sheet. Fourth, AMI must review all contracts with physicians and others employed at the hospital. The Agreement in Principle further specified that it was "subject to the execution of a definitive agreement by AMI and CORHCC." The definitive agreement was to contain, in addition to the terms and conditions of the Agreement in Principle, "such terms and conditions as are customarily found in such agreements." The Agreement in Principle also specified that the sale of the facility was contingent upon ratification by the boards of directors of CORHCC, Creighton University, and AMI.

On August 24, 1984, AMI and CORHCC signed the definitive agreement. Rather than an outright sale, as contemplated by the Agreement in Principle, the definitive agreement structured the conveyance of assets between the parties as a prepaid lease. It provided that the payments by AMI were to be made in exchange for a fourteen-year lease of the assets comprising St. Joseph Hospital, with title to pass to AMI at the end of the lease period through an option to purchase the assets at a cost of $1,000. The definitive agreement also contained express representations by both AMI and CORHCC that they had approved their eventual sale of the assets, and the sale was within their corporate powers. Simultaneously with the execution of the lease, CORHCC placed into escrow via an escrow document appropriate deeds, assignments, and bills of sale pursuant to which CORHCC would sell, assign, transfer, and deliver to AMI a good and marketable title of the assets free and clear of any liens. The definitive agreement provided that the escrow document would be delivered to AMI if AMI exercised its purchase option under the lease. On November 19, 1984, the actual lease was signed and notarized by AMI and CORHCC. Under the lease, AMI agreed that its "rent" would be the total purchase price of the assets comprising St. Joseph Hospital and that the basic rent shall be paid as specified in the Agreement in Principle.

In its Medicare cost reports for its fiscal years ending August 31, 1985 through 1987, AMISUB, believing that the Agreement in Principle was an enforceable agreement, claimed depreciation (and other ownership costs) based on the acquisition cost of the assets comprising St. Joseph Hospital. The Office of the General Counsel of the Health Care Financing Administration disagreed, and in an April 11, 1988 memorandum stated that the Agreement in Principle did not constitute an enforceable agreement and, therefore, AMISUB was not entitled to be grandfathered into a step up in the cost basis of the acquired assets. In June 1989 an intermediary reopened AMISUB's cost reports to apply the provisions of DEFRA and limit AMISUB's reimbursable acquisition costs to CORHCC's historical costs. The intermediary's adjustments denied the stepped-up ba-

sis of assets taken by AMISUB, resulting in a reduction in Medicare reimbursement of approximately $98,000 for FY 1985, $226,000 for 1986, and $120,000 for FY 1987.

Pursuant to 42 U.S.C. §§ 1395oo(a), AMISUB requested a hearing on the intermediary's adjustments before the Provider Reimbursement Review Board (the "Board"). After a hearing, the Board issued a decision affirming the intermediary's adjustments. The Board concluded that the Agreement in Principle was not an enforceable agreement prior to July 18, 1984, and that AMISUB was not entitled to step up the basis of its assets for depreciation purposes. The Administrator of the HCFA subsequently declined to review the Board's decision, making it the final decision of the Secretary, and AMISUB sought judicial review in the district court. The district court affirmed the Secretary's decision, and this appeal followed.

## II.

■■■ The district court affirmed the Board's decision, finding that the Board's

decision was supported by substantial evidence in the record as a whole. The district court applied the "substantial evidence" standard of review under the Administrative Procedure Act. See 5 U.S.C. § 706(2)(E). In doing so, the district court found that the term enforceable agreement as used in DEFRA was ambiguous and the Secretary's construction and application of the term were entitled to deference. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694, reh'g denied, 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984). On this basis, the court did not review the statute de novo. Although we affirm the district court, under the circumstances presented we disagree with its applied standard of review. We note initially that the Board's decision was not based upon an interpretation or application of any regulations or guidelines promulgated by the Secretary. The Board found and applied Nebraska state law.[2] This being the basis of the Board's decision, under the principle of

2. The Board did not follow its approach in the recent case of Nursing Center v. Shalala, 990 F.2d 645 (D.C.Cir.1993). There, in a case involving the identical issue of whether a nursing center had entered into an enforceable agreement under DEFRA, the Board applied the Secretary's own "restrictive" guidelines in determining that the agreement was not enforceable. In relevant part, the guidelines, which were issued by the Secretary to explain to fiscal intermediaries how the enforceable-agreement exception should be applied, provided as follows:

> When reviewing a provider's claim to this exception, use the following guidelines to assist you in determining whether the transaction was governed by the terms of an enforceable agreement.
> * The agreement must be in writing.
> * It must be signed by authorized representatives of both buyer and seller and should be notarized to establish the effective date of the agreement.
> * It should contain specific performance provisions which permit both buyer and seller to compel the other to complete the sale. Question agreements which do not contain penalty or forfeiture provisions, such as the loss of deposit or other monetary penalties....
> * It should specify most or all of the conditions upon which the transaction will be consummated....
> * Contingent agreements may also be considered enforceable. In general, the more con-

> tingencies upon which an agreement is based, the less enforceable it will be viewed. To be considered enforceable for purposes of DEFRA, a contingent agreement would, at a minimum, be one that is outside the power of either party to influence; or, the contingency is one that requires reasonable, business-like actions on the part of either party. Contingent agreements require careful scrutiny.

Medicare Intermediary Manual: Audit Procedures Pub. 13–4 § 4408.1, at 6–32 (Apr. 1987).

The Board held there was no enforceable agreement under the statute and the guidelines. On appeal to the district court, the nursing center did not dispute the Board's interpretation of the statutory language, as reflected in the guidelines, but rather its application of that interpretation to the disputed agreement. On this basis, the D.C. Circuit stated that it reviewed the application under the APA arbitrary and capricious standard of review. See 5 U.S.C. § 706(2)(A). Thus, unlike the Board's position here, the D.C. Circuit was reviewing the Secretary's application of her own guidelines. Neither the Board nor any of the parties to the present appeal make any such similar contention. The D.C. Circuit observed:

> [W]e do not consider at this time the relevance of state laws of contract to the Secretary's interpretation of the key phrase, but rather whether the Secretary, having interpreted the phrase by guidelines, acted arbitrarily and capriciously in the way she applied that interpretation to the present facts....

*Chevron,* no deference is due to the Board in its interpretation of the statute as to whether the agreement was enforceable.[3]

The Board simply stated that "DEFRA did not define what an enforceable agreement should be under federal law. Therefore, state law, in this case Nebraska law, should be applied." In *United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), the Court made clear that, absent a congressional directive to the contrary, incorporation of state law as a federal rule of decision is appropriate when the application of state law will not undermine federal interests. *Id.* 440 U.S. at 728, 104 S.Ct. at 1458. In the present controversy, we deem it to have been appropriate for the Board to determine whether an enforceable agreement existed by looking to state contract law.[4] We have reviewed the analysis of the Board and find that it has properly applied controlling contract principles of the state of Nebraska. Principles governing an enforceable contract are well settled under common law, and Nebraska law conforms to those principles. In reviewing the overall record and facts governing the conduct of the parties, we find that the Board was not in error and for the reasons set forth by the Board, the Agreement in Principle was not

an enforceable agreement. The Board's conclusion that the Agreement in Principle was not enforceable was based on (1) the existence of conditions precedent; (2) the lack of a specific time for performance; (3) the failure to obtain a required Nebraska Certificate of Need ("CON") by the effective date of DEFRA; and (4) the parties' continuing negotiation of the structure of the transfer of assets after the execution of the Agreement in Principle. Each of these was sufficient, under Nebraska law, to find that the Agreement in Principle was not an enforceable agreement.

Under Nebraska law, "where a contract is executed but its effectiveness or fulfillment is dependent upon the doing of an agreed-upon condition before it shall become a binding contract, such contract cannot be enforced unless the condition is performed." *Metschke v. Marxsen,* 176 Neb. 240, 125 N.W.2d 684, 687 (1964); *see Schmidt v. J.C. Robinson Seed Co.,* 220 Neb. 344, 370 N.W.2d 103 (1985) (defining a condition precedent as a "condition which must be performed before the parties' agreement becomes a binding contract or a condition which must be fulfilled before [the] duty to perform an existing contract arises"). The language contained in the Agreement in

---

Indeed, although the Secretary's understanding of enforceability may be more restrictive than that embodied in the general law of contracts, in that the guidelines would deem unenforceable, for Medicare purposes, certain contingent contracts that contract law might regard as enforceable, see Manual § 4408.1, at 6–32, the guidelines are nonetheless consistent with the congressional purpose motivating the DEFRA exception. Whether those guidelines can be validly applied to a contingent contract enforceable under state law but not within the Secretary's definition can await another day.... [T]he agreement in this case would be unenforceable under state law, as well as the Secretary's regulations.

*Nursing Center,* 990 F.2d at 649–50. The court made an alternative holding that the Secretary's decision that the contract was not enforceable "could be reached applying both the statutory and common law of contracts derived from either Pennsylvania or Tennessee." In the case at bar, the Board applied only Nebraska state law, and we therefore review it *de novo.*

**3.** In *Chevron,* the Court outlined the analysis that federal courts are to follow when confronted with an agency's construction of a statute which the agency administers. The Court indicated

that in such a situation, the court asks two questions:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* 467 U.S. at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted).

**4.** The Board having chosen to apply state contract law principles to resolve the dispute rather than applying its own guidelines, we are constrained to do likewise. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947).

845

Principle expressly states that AMISUB's obligation to purchase St. Joseph Hospital was "condition[ed] upon" obtaining a CON, "subject to the execution of a definitive agreement," and "contingent upon" ratification of three boards of directors. Although AMISUB's Board approved the sale on May 24, 1984, and Creighton and COHRCC approved the sale on June 4, 1984, CORHCC and AMISUB entered into their definitive agreement on August 24, 1984 and the CON was not obtained until November 16, 1984. Both of these conditions were satisfied after the effective date of DEFRA, and, AMISUB's arguments to the contrary notwithstanding, they rendered the Agreement in Principle unenforceable until their fulfillment. Consequently, the Board did not err in finding that the existence of conditions precedent prevented the Agreement in Principle from being an enforceable agreement under DEFRA.

Likewise, to be enforceable under Nebraska law, a contract for the transfer of real property must contain the essential elements of a contract with sufficient certainty and definiteness as to the parties, property, consideration, terms, and time of performance. *Satellite Dev. Co. v. Bernt*, 229 Neb. 778, 429 N.W.2d 334, 337 (1988). The Agreement in Principle lacked a definite time for performance. While AMISUB argues that a court may imply a reasonable amount of time in satisfaction of this requirement, *see Davco Realty Co. v. Picnic Foods, Inc.*, 198 Neb. 193, 252 N.W.2d 142, 147 (1977), we do not believe it was error for the Board and district court not to do so. The existence of conditions precedent to the enforceability of the agreement rendered a determination of a reasonable time for performance speculative. As such, an essential element to the formation of an enforceable contract under Nebraska law was lacking, and the Board did not err in so finding.

Finally, the Agreement in Principle and the definitive agreement were sufficiently dissimilar to show that the parties were continuing to negotiate the transaction beyond the effective date of DEFRA, and that they were not bound by the terms of the Agreement in Principle. The Agreement in Princi-

ple contemplated a sale of the assets, and the definitive agreement structured the transaction as a lease. That the ultimate price paid remained approximately the same does not alter the conclusion that the terms of the two agreements were materially different, reflecting the nonbinding nature of the Agreement in Principle. *See Reynolds & Maginn v. Omaha Gen. Iron Works*, 105 Neb. 361, 180 N.W. 584, 586 (1920) (holding that terms of preliminary informal agreement must be sufficiently definite as to leave no essential term to future agreement). Congress enacted § 2314(c)(1) out of a concern about retroactivity and fairness to parties that had negotiated and entered into binding agreements before the effective date of DEFRA. *See Nursing Center*, 990 F.2d at 647. The material difference between the Agreement in Principle and the definitive agreement demonstrates that negotiations were ongoing and that the parties did not have settled expectations before July 17, 1984. Under such circumstances, the grandfather exception to the valuation limitation of DEFRA under § 2314(c)(1) is not applicable. The judgment of the district court is affirmed.